Edward M. OBER; Robin D. Silver, Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

No. 95–70352.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 1996.

Decided May 14, 1996.

David Baron, Arizona Center for Law in the Public Interest, Tucson, Arizona, for petitioners.

Karen L. Egbert, Environmental Defense Section, United States Department of Justice, Washington, D.C., for respondents.

Alan Waltner, Law Offices of Alan Waltner, Oakland, California, for Amici Curiae.

Before: SCHROEDER and TROTT, Circuit Judges, and REED, District Judge.[*]

TROTT, Circuit Judge:

## OVERVIEW

This is a petition to review a final decision rendered by the Environmental Protection Agency (EPA) under the Clean Air Act. The EPA approved Arizona's State Implementation Plan (Implementation Plan or SIP) for the control of airborne particulate matter in Phoenix, determining that it complied with the requirements of the Clean Air Act and the guidelines promulgated thereunder. Petitioners, Phoenix residents adversely affected by excessive levels of airborne particulates, believe that the EPA's approval of Arizona's Implementation Plan violated the Clean Air Act and the Administrative Procedure Act. The American Lung Association and the American Lung Association of Arizona filed an amicus curiae brief in support of this petition. We grant the petition, vacate EPA's approval of the PM–10 Implementation Plan for Phoenix, and remand to EPA.

## STATUTORY OVERVIEW

Pursuant to the Clean Air Act, the EPA identified particulate matter under ten microns in size (PM–10) as a criteria pollutant to be regulated under state and federal programs. The EPA promulgated the National Ambient Air Quality Standards (NAAQS) to specify the maximum permissible concentrations of the criteria pollutants in the ambient air. For PM–10, the EPA adopted two NAAQS, an annual standard and a 24–hour standard. See 40 C.F.R. § 50.6 (1994).[1] To ensure compliance with the NAAQS, each state must submit to the EPA an implementation plan that meets certain substantive requirements. See 42 U.S.C. § 7410. The EPA reviews each submitted implementation plan and approves or disapproves it. If approved in whole or in part, the approved provisions become federally enforceable. 42 U.S.C. § 7413. If disapproved, the state is subject to sanctions and the control measures of the Federal Implementation Plan. 42 U.S.C. §§ 7410(c), 7509.

When an area fails to meet the NAAQS, it is designated a "nonattainment area," and the Clean Air Act imposes additional requirements on implementation plans in those areas. For PM–10, the Clean Air Act classifies nonattainment areas as "moderate" or "serious." Under the 1990 Amendments, each PM–10 nonattainment area was initially classified as "moderate," with an attainment date no later than December 31, 1994. 42 U.S.C. § 7513(a), (c)(1).

---

[*] Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

1. The 24–hour standard is attained when the expected number of days per calendar year with a 24–hour average concentration above 150 micrograms per cubic meter is equal to or less than one. The annual standard is attained when the expected annual arithmetic mean concentration is less than or equal to 50 micrograms per cubic meter. 40 C.F.R. § 50.6.

In April 1992, EPA issued a *General Preamble* describing EPA's interpretation of the 1990 Amendments and review of implementation plans. 57 Fed.Reg. 13498 (April 16, 1992). States with moderate PM–10 nonattainment areas must submit implementation provisions including: 1) provisions to assure that the state will implement "reasonably available control measures" no later than December 10, 1993; 2) a demonstration that the plan will provide for attainment as expeditiously as practicable, but no later than December 31, 1994, *OR* a demonstration that attainment by that date is impracticable; and 3) qualitative milestones which are to be achieved every three years and which demonstrate "reasonable further progress" toward attainment by December 31, 1994. *Id.* at 13538–40; 42 U.S.C. §§ 7502(c), 7513a(a) & (c). The implementation plan must also provide "necessary assurances" of resources and of state responsibility for implementing the plan. 42 U.S.C. § 7410(2)(E).

If an area cannot practicably attain the NAAQS by the December 31, 1994 deadline, the EPA Administrator may reclassify it as a "serious" nonattainment area. 42 U.S.C. § 7513(b)(2). A "serious" nonattainment designation requires the state to submit additional plan provisions demonstrating the use of the "best available control measures" to reduce PM–10 emissions. 42 U.S.C. § 7513a(b)(1). The state must submit a revised implementation plan demonstrating attainment of the NAAQS in the "serious" nonattainment area as expeditiously as possible, but no later than December 31, 2001. 42 U.S.C. § 7513(c)(2).

The Clean Air Act provides for review by the court of appeals of the Administrator's action approving an implementation plan. 42 U.S.C. § 7607(b). The court may award the costs of litigation "whenever it determines that such an award is appropriate." 42 U.S.C. § 7607(f).

## FACTS AND PRIOR PROCEEDINGS

According to the American Lung Association, which filed an amicus curiae brief, the PM–10 pollution in the Phoenix area presents a serious health risk to asthmatic children and adults and to people with chronic lung disease. Pursuant to the 1990 Amendments· to the Clean Air Act, the Phoenix area was originally designated a moderate nonattainment area for PM–10, with an attainment date of December 31, 1994. *See* 40 C.F.R. § 81.303 (1994). On July 28, 1994, the EPA proposed to approve Arizona's PM–10 Implementation Plan revision for Phoenix based on the EPA's preliminary finding that the State's submittal met the requirements of the Clean Air Act.

During the public comment period, EPA received comments from several groups, including Petitioners, protesting approval of the Implementation Plan. On April 10, 1995, EPA issued its final approval of the moderate PM–10 Final State Implementation Plan Revision for Phoenix. As·a result of EPA's approval of Arizona's demonstration of the impracticability of attainment of the PM–10 annual standard, EPA proposed to reclassify Phoenix from a "moderate" to a "serious" nonattainment area for PM–10. 60 Fed.Reg. 30046 (June 7, 1995).

On May 1, 1995, Petitioners filed this timely petition for review asking this court to vacate EPA's approval and remand to EPA to disapprove the plan. Petitioners further request that they be awarded the costs of litigation, including reasonable attorney and expert witness fees.

## STANDARD OF REVIEW

The standard of review is whether EPA's actions were either (a) arbitrary, capricious, an abuse of discretion or contrary to law; or (b) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. *Abramowitz v. United States Envtl. Protection Agency,* 832 F.2d 1071, 1074–75 (9th Cir.1987). When the court reviews an agency's construction of a statute that is silent or ambiguous with respect to an issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

## DISCUSSION

## I

### Violations of the Clean Air Act

Petitioners argue that the EPA's approval of the Phoenix PM–10 Implementation Plan violated the Clean Air Act because the Implementation Plan: 1) failed to address the 24–hour standard; 2) failed to consider transportation control measures as presumptively "reasonably available control measures"; and 3) failed to provide adequate state assurances for implementation of the plan.

### A. State's Failure to Address 24–Hour Standard

■ Arizona's Implementation Plan demonstrated the impracticability of attainment of the PM–10 annual standard by December 31, 1994, but did not separately address: 1) "reasonably available control measures" targeting the 24–hour standard; 2) attainment of or the impracticability of attainment of the 24–hour standard; or 3) "reasonable further progress" for the 24–hour standard. As a result, Petitioners contend that the Phoenix PM–10 Implementation Plan failed to comply with the mandates of the Clean Air Act, and that the EPA abused its discretion by approving a deficient implementation plan. The EPA, on the other hand, argues that Arizona's Implementation Plan did not need to separately address the 24–hour standard because the Phoenix area would be redesignated a "serious" nonattainment area for PM–10 unless the plan provided for attainment of *both* the annual and the 24–hour NAAQS.

To resolve the issue of whether the Clean Air Act requires a separate demonstration of attainment or the impracticability of attainment for the annual standard and the 24–hour standard, we must examine in detail the various statutory provisions concerning implementation plans. In the most general sense, the Clean Air Act requires that implementation plans provide for the attainment of the NAAQS. 42 U.S.C. § 7410(a)(1), (2)(C). All implementation plans must also "provide for the establishment and operation of appropriate devices, methods, systems and proce-

dures necessary to ... monitor, compile, and analyze data on ambient air quality." 42 U.S.C. § 7410(a)(2)(B)(i). The attainment date for an area designated "nonattainment" for an air quality standard "shall be the date by which attainment can be achieved as expeditiously as practicable." 42 U.S.C. § 7502(a)(2)(A). Nonattainment area implementation plans must contain provisions that: 1) "provide for the implementation of all reasonably available control measures as expeditiously as practicable ... and ... provide for attainment of the national ambient air quality standards"; 2) "require reasonable further progress"; and 3) include "other control measures, means or techniques ... as well as schedules and timetables for compliance, as may be necessary and appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part." 42 U.S.C. § 7502(c)(1), (2), (6).

These general provisions are followed by more specific provisions for moderate and serious nonattainment areas for the various criteria pollutants. For a moderate PM–10 area, "the attainment date shall be as expeditiously as practicable ... [and] shall not extend beyond December 31, 1994." 42 U.S.C. § 7513(c)(1). An implementation plan in a moderate PM–10 area must include "[e]ither (i) a demonstration (including air quality modeling) that the plan will provide for attainment by the applicable attainment date; or (ii) a demonstration that attainment by such date is impracticable." 42 U.S.C. § 7513a(a)(1)(B). The EPA Administrator "may reclassify as a Serious PM–10 nonattainment area ... any area that the Administrator determines cannot practicably attain *the* national ambient air quality *standard* for PM–10 by the attainment date ... for Moderate areas." 42 U.S.C. § 7513(b)(1) (emphasis added to demonstrate that statute provides for a single PM–10 standard).

The EPA, relying on the last two provisions, argues that once Arizona demonstrated that attainment of the annual PM–10 standard in Phoenix was impracticable, the area would automatically be redesignated a "serious" nonattainment area for PM–10 and, therefore, a separate demonstration of the

practicability or impracticability of attaining the 24–hour standard was unnecessary. Petitioners argue that such an interpretation violates the Clean Air Act's other provisions and its overriding requirement that implementation plans provide for the attainment of all of the NAAQS as expeditiously as practicable.

The statute does not directly speak to this issue. There are two NAAQS for PM–10, and we find the statute silent as to whether an implementation plan must independently address both if it demonstrates the impracticability of attaining one of the standards. Therefore, we must determine whether the EPA's interpretation is based on a permissible construction of the statute. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

The Clean Air Act designates an area as an attainment or a nonattainment area for each criteria pollutant, not for the individual 24–hour or annual air quality standard. We accept the EPA's interpretation that unless an area can attain both the 24–hour and the annual standard for PM–10 by the statutory deadline, it will be reclassified as a "serious" nonattainment area. We find this to be a reasonable interpretation of the Clean Air Act, and agree that Phoenix will be redesignated as a "serious" nonattainment area for PM–10 based on the Implementation Plan's demonstration that attainment of the PM–10 annual standard is impracticable.

We agree with Petitioners, however, that Phoenix's inability to attain the annual PM–10 standard did not relieve Arizona's duty to independently examine and implement "reasonably available control measures" targeting the 24–hour standard, to independently demonstrate attainment of or the impracticability of attainment of the 24–hour standard, and to independently demonstrate "reasonable further progress" for that standard. The general provisions of the Clean Air Act repeatedly emphasize that implementation plans must provide for the attainment of the NAAQS as expeditiously as practicable. For PM–10, the EPA promulgated two separate NAAQS-the annual standard and the 24–hour standard-which differ in the following respects. First, the 24–hour standard offers protection against dangerous short-term ex-

posures to high PM–10 levels, a protection that is distinct from the protection against chronic degradation in lung function provided by the annual standard. Second, the sources of PM–10 violations differ for the annual and the 24–hour standard: violations of the 24–hour standard are generally caused by localized sources such as construction projects, whereas violations of the annual standard tend to be caused by more diverse, dispersed sources. Third, control measures differ in effectiveness for the 24–hour standard and the annual standard.

These differences emphasize the importance of viewing PM–10's two NAAQS individually and of requiring independent treatment of them in an implementation plan. The Clean Air Act specifically requires the attainment of *all* of the NAAQS as expeditiously as practicable. If the 24–hour standard could have been attained by December 31, 1994, or if it can be attained more expeditiously than the annual standard, the Clean Air Act requires the implementation plan to provide for such attainment. Such independent treatment furthers the Clean Air Act's goals of protecting health and achieving clean air. *See* 42 U.S.C. § 7401. The fact that the area will be redesignated as a "serious" nonattainment area for a pollutant because the state demonstrates that it cannot practicably attain one of the NAAQS does not absolve the state's responsibility to address the NAAQS for that pollutant separately and to demonstrate that the state will provide for attainment of each standard as expeditiously as practicable.

Here, Arizona failed to independently examine the 24–hour standard. First, the State did not evaluate the impact of certain control measures on the 24–hour standard. The EPA summarily dismisses any distinction between "reasonably available control measures" for the 24–hour standard versus the annual standard, stating that "the justifications for rejecting measures as ['reasonably available control measures'] are identical regardless of whether attainment of the 24–hour standard or the annual standard is at issue." EPA Brief, at 42 n. 33. However, independent testing of control measures targeting the 24–hour standard was necessary

to determine which control measures were "reasonably available" in relation to the 24–hour standard. It is possible that some control measures directed at controlling emissions on construction sites would have significantly alleviated violations of the 24–hour NAAQS. For instance, Petitioners assert that the prohibition of tilling on windy days reduces violations of the 24–hour standard, while it would have only a de minimis effect on the annual standard. Similarly, installing windbreaks and paving roads, which would help reduce the 24–hour standard, are economically infeasible on a large scale, but may be reasonable on a localized scale. Control measures were not evaluated for their reasonableness in relation to the 24–hour standard, but only based on the modeling and data developed for the annual standard. As a consequence, certain measures may have been rejected because they provide only de minimis benefit or are economically or technologically infeasible in relation to the annual standard, but would be reasonable in relation to the 24–hour standard.

Second, Arizona did not perform air quality modeling for the 24–hour standard or demonstrate attainment of or the impracticability of attaining that standard. The Clean Air Act requires an implementation plan to include schedules and timetables for compliance to provide for attainment of the NAAQS, as well as "air quality modeling" when demonstrating attainment. 42 U.S.C. §§ 7410(a), 7502(c)(6), 7513a(a)(1)(B). Modeling inventories are used for attainment demonstration, evaluation of control measures, projections for future years, and other emissions information. *See PM–10 Emission Inventory Requirements Final Report*, p. 7 (July 1994) (*Emission Report*). The *Emission Report*, which was prepared for the EPA, states that in the temporal resolution of inventory:

> States will have to model short-term (daily) and long-term (annual) air quality for PM–10 to assure that both standards will be protected, even if air quality measurements show exceedances for only one time period.

*Emission Report* at 9. This report emphasizes the importance of conducting modeling

for *both* standards to ensure that *both* will be protected.

In reference to the air quality modeling it conducted, the Arizona Department of Environmental Quality explained in the Implementation Plan submittal:

> [T]he annual averaging period was selected for initial modeling in preference to the less instructive 24–hour period. This decision is based on the fact that the candidate peak 24–hour periods are significantly influenced by local construction activities for which very little specific information is available for modeling purposes. The annual period is much less influenced by local construction and allows the use of the existing emission inventory and receptor modeling data.

*Final Implementation Plan Revision*, at 9–16 (Feb.1994). This passage demonstrates that the state did not perform air quality modeling for the 24–hour standard. The development of independent data for the 24–hour standard, however, was necessary to determine whether attainment of the 24–hour standard was in fact practicable by the statutory deadline or, alternatively, to help achieve attainment as expeditiously as would be practicable. The State was not relieved of this burden simply because it could analyze the annual standard using "existing emission inventory and receptor modeling data."

Finally, Arizona also neglected to meet the "reasonable further progress" requirements for the 24–hour standard. 42 U.S.C. § 7502(c)(2). Progress toward attainment of the 24–hour standard will differ from that for the annual standard. The State will have to demonstrate qualitative milestones toward attainment of the 24–hour standard in light of implementing "reasonably available control measures" targeting the 24–hour standard and attainment information revealed by the independent modeling and testing for the 24–hour standard.

Accordingly, the EPA's interpretation of the Implementation Plan's attainment demonstration requirements for the 24–hour standard was not based on a permissible construction of the Clean Air Act. The EPA's rationalization that because the area will be redesignated "serious," an independent anal-

ysis of the 24–hour standard is unnecessary does not further the Clean Air Act's ultimate goal of attainment of each of the NAAQS as expeditiously as possible or comply with the strict provisions related to achieving that attainment. We conclude that because there are two separate NAAQS for PM–10, the Clean Air Act requires an implementation plan to address each of them. Thus, EPA's approval of an implementation plan that failed to independently address the 24–hour standard violated the Clean Air Act. We remand to the EPA for the EPA, in turn, to require the State to submit an independent demonstration of: 1) the implementation of all "reasonably available control measures" targeting attainment of the 24–hour standard; 2) attainment of or the impracticability of attainment of the 24–hour PM–10 standard; and 3) "reasonable further progress" for that standard.[2]

### B. Transportation Control Measures

■ Petitioners argue that Transportation Control Measures are presumptively "reasonably available control measures" under *Delaney v. Environmental Protection Agency,* 898 F.2d 687 (9th Cir.), *cert. denied,* 498 U.S. 998, 111 S.Ct. 556, 112 L.Ed.2d 563 (1990). In *Delaney,* which was similar to this case, the petitioners challenged EPA's approval of Arizona's Carbon Monoxide Implementation Plans for Maricopa and Pima Counties. One of the petitioners' primary contentions was that the plans failed to provide for sufficient control measures. The court noted that an EPA guidance document provided that the measures listed in 42 U.S.C. § 7408 were presumed reasonably available, and that a state could "reject one of th[o]se measures only by showing that the measure either would not advance attainment, would cause substantial widespread and long-term adverse impact, or would take

too long to implement." *Id.* at 692. Petitioners argue that Arizona did not presume the Transportation Control Measures to be "reasonably available control measures" or meet the requirements for rejection of those control measures.

*Delaney,* however, was decided before the 1990 Amendments to the Clean Air Act. The EPA promulgated the *General Preamble* to describe its interpretation of the amendments and to instruct on the provisions concerning implementation plan revisions for nonattainment areas. 57 Fed.Reg. 13498 (April 16, 1992). The *General Preamble* stated that the EPA was changing its prior interpretation that Transportation Control Measures listed in section 108(f) were "reasonably available control measures" for all areas:

> [B]ased on experience with implementing [Transportation Control Measures] over the years, EPA now believes that local circumstances vary to such a degree from city-to-city that it is inappropriate to presume that all section 108(f) measures are reasonably available in all areas.

*Id.* at 13560. The *General Preamble* noted that the EPA was free to change its interpretation of the "reasonably available control measures" provision. Then, specifically rejecting *Delaney*'s holding, it stated that the Transportation Control Measures should be considered on an area-specific basis. *Id.* at 13560–61.

Accordingly, after the 1990 Amendments and the *General Preamble, Delaney* no longer accurately reflects the EPA's interpretation of the requirements for a state's rejection of Transportation Control Measures as "reasonably available." The EPA had the discretion to alter its previous policy of presuming all of the Transportation Control Measures to be "reasonably available" on a

---

**2.** While we realize that the December 31, 1994 deadline for attainment has passed and that the EPA has proposed to reclassify Phoenix as a "serious" nonattainment area, the state must still comply with the "moderate" area implementation plan provisions. *See* 42 U.S.C. § 7513a(b)(1). Therefore, despite the fact that the December 31, 1994 deadline has passed, Arizona's Implementation Plan must address the implementation of all "reasonably available con-

trol measures" targeting the 24–hour standard, attainment of the 24–hour standard as expeditiously as practicable, and "reasonable further progress" for that standard in order to be in compliance with the "moderate" area implementation plan provisions. This should not be construed to prevent or stay the EPA's reclassification of the Phoenix area to a "serious" nonattainment area for PM–10.

national scale. Current EPA guidance provides that the state must address the "reasonableness" of *all* control measures, including the Transportation Control Measures, based on the local circumstances, and then either implement them or provide a justification for their rejection. This represents a reasonable interpretation of the Clean Air Act and the control measures provisions. Therefore, the EPA did not abuse its discretion by rejecting Petitioners' argument that the Transportation Control Measures are presumptively "reasonably available."

### C. State Assurances to Implement Plan

■ Petitioners contend that the EPA's approval of the Implementation Plan violated the Clean Air Act because the plan failed to provide necessary assurances by the State for the implementation of plan provisions that rely on a local or regional government or agency, as required by 42 U.S.C. § 7410(a)(2)(E)(iii). EPA asserts that Arizona's statutory scheme addressing the implementation of control measures and emission limitations provides adequate assurances. Specifically, the Arizona statute states that if the Director of the Arizona Department of Environmental Quality determines that a control measure is not being implemented, he must make a finding to this effect and provide an opportunity to confer. If the Director subsequently finds that the failure has not been corrected, the State must file an action for injunctive relief. Ariz.Rev.Stat. Ann. § 49–406.J.

Petitioners argue that this Arizona statute provides no assurance of state responsibility because the Director is not legally bound to act under the statute and no time limits apply to the process. Petitioners believe that this statutory scheme gives the state officials discretion to ignore the law's requirements. Thus, according to Petitioners, the Implementation Plan did not provide adequate assurances and did not meet the Clean Air Act's mandates for enforceability, timely

implementation of control measures, and expeditious attainment.

We defer to EPA on this issue. EPA examined Arizona's statute, procedures, and commitment to enforcement and found that they comply with the Clean Air Act. The Clean Air Act's requirement of state assurances is general, requiring the state to ensure its responsibility for implementing the plan provisions that rely on a local or regional government or agency. In Arizona, if the Director of Arizona's Department of Environmental Quality finds that a control measure is not being implemented and that failure is not corrected, the State must file an action for injunctive relief. Thus, Arizona's statute clearly addresses state responsibility and action for enforcing plan provisions that rely on local and regional entities. It is only reasonable that the State await a preliminary finding by the Director that the local or regional government is not implementing a control measure before filing for injunctive relief. Therefore, we conclude that EPA did not abuse its discretion by finding that the Implementation Plan provided adequate assurances.[3]

## II

### Violations of Administrative Procedure Act

The EPA's approval of the PM–10 Implementation Plan was a rulemaking action subject to the requirements of the Administrative Procedure Act (APA). The APA requires an agency to: 1) publish a general notice of proposed rulemaking in the Federal Register; 2) give interested parties an opportunity to participate in the rulemaking through submission of data, views, and arguments; and 3) after consideration of the relevant matter presented, incorporate in the rules a concise general statement of the rules' basis and purpose. 5 U.S.C. § 553(b)-(c).

Petitioners contend that the EPA violated the notice and comment provisions of the

---

3. This panel will not reach the issue of the adequacy of Arizona's assurances of funding and enforcement resources pursuant to 42 U.S.C. § 7410(a)(2)(E)(i). The EPA will have to reevaluate Arizona's resource commitments in light of

any new control measures that are implemented or any other changes that occur in the Implementation Plan as a result of our decision here today.

APA when it: 1) accepted and relied on additional information justifying the rejection of certain control measures submitted after the comment period; 2) substituted its own determination of "reasonable further progress" and granted the State more credit than the State itself had claimed; and 3) included in the PM–10 Implementation Plan measures from the Carbon Monoxide and Ozone Implementation Plans.

### A. Post-Comment Period Justifications for Rejecting Certain Control Measures

The Clean Air Act requires "moderate" area implementation plans to include:

> Provisions to assure that reasonably available control measures for the control of PM–10 shall be implemented no later than December 10, 1993 . . . .

42 U.S.C. § 7513a(a)(1)(C). For each of the available control measures, the state must either implement the measure or provide a reasoned justification for rejecting it. A state may show that a measure is unreasonable because it provides only de minimis benefit or because it is technologically or economically infeasible. *General Preamble,* 57 Fed.Reg. 13540–41.

The EPA proposed approval of the Phoenix Implementation Plan on July 28, 1994 and set August 29, 1994 as the deadline for public comment. 59 Fed.Reg. 38402. In December 1994, long after the close of the comment period, the director of the Arizona Department of Environmental Quality sent approximately 300 pages of documents to the EPA in response to the EPA's request to submit additional justifications for rejecting specific control measures. These documents demonstrated the State's view that several control measures identified by Petitioners were not reasonably available. They were not part of the Implementation Plan submittal and were not on record during the public comment period. Petitioners first learned of the additional documents when the EPA announced its final decision.

Petitioners assert that more than 160 control measures were identified for PM–10. The precise number of control measures that were implemented or were rejected as unrea-

sonable is not clear. What is clear is that the EPA requested and accepted justifications for rejecting certain measures after the comment period closed. Petitioners argue that the EPA's acceptance of these "post hoc" justifications violated the Clean Air Act and the APA. We agree.

This circuit has previously addressed when an agency can consider additional information after the close of a public comment period when making a final rule. In *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392 (9th Cir.1995), the Idaho Conservation League and Committee for Idaho's High Desert appealed the district court's judgment setting aside the final rule that listed the Bruneau Hot Springs Snail as an endangered species. The district court determined that the U.S. Fish and Wildlife Service (FWS) had committed several procedural errors during the period between the initial proposal and the final listing. One of the errors involved the FWS's failure to provide the public with notice of and an opportunity to comment on a relevant report from the U.S. Geological Survey (USGS). On appeal, the Ninth Circuit stated that:

> An agency may use supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown.

*Id.* at 1402 (quoting *Solite Corp. v. Environmental Protection Agency,* 952 F.2d 473, 484 (D.C.Cir.1991)).

Then, as to the USGS report, the court explained that the necessity for notice and opportunity to comment was heightened because "FWS relied largely on the USGS study to support its final rule," and "the USGS report was critical to FWS' decision." *Id.* at 1403. The court also noted that "[o]pportunity for public comment is particularly crucial when the accuracy of important material in the record is in question." *Id.* Ultimately, the court held that FWS violated the APA by making its listing decision "without observance of procedure required by law." *Id.* at 1404 (quoting 5 U.S.C. § 706(2)(D)).

Here, the post-comment period information involved justifications for rejecting "reasonably available control measures." Control Measures are the backbone of the implementation plan because they are the device by which attainment of the NAAQS is achieved. A state must justify its rejection of a control measure, and these justifications are integral to compliance with the Clean Air Act. Obviously, Arizona had not adequately addressed its rejection of certain control measures if it needed 300 pages of post-comment period documentation to justify its rejection of some of those measures. The challenged post-comment period justifications did not merely expand on prior information and address alleged deficiencies. Instead, they addressed the submitted Implementation Plan's failure to comply with an essential provision of the Clean Air Act. Therefore, they were relied on and were critical to the EPA's approval of the Implementation Plan. Furthermore, the accuracy of the additional information submitted after the comment period is in question because Petitioners argue that many of the asserted justifications do not in fact support rejection of the control measures. These justifications should have been available for public comment *before* the EPA proposed approval of the Implementation Plan.

EPA argues that the 300 pages of justifications represent the type of supplementary information that is permissible under *Idaho Farm Bureau* because they "expand[ ] on and confirm[ ] information contained in the proposed rulemaking and address[ ] alleged deficiencies in the pre-existing data." 58 F.3d at 1402. The EPA argues that under Petitioners' view, there would be an endless cycle of comments back and forth. *See Rybachek v. Environmental Protection Agency,* 904 F.2d 1276, 1286 (9th. Cir.1990).

In *Rybachek,* 904 F.2d 1276 (9th Cir.1990), the petitioners argued that they had been denied a meaningful opportunity for comment when the EPA added over 6000 pages to the administrative record after the public comment period had ended. *Rybachek* involved a mining association's challenge to regulations promulgated by the EPA related to sluice-box discharge water. During the

rulemaking process, commenters expressed concerns about the proposed regulations' effect on smaller mines. As a result, the EPA solicited further public comment on that issue. Following the special comment period, EPA published a notice stating that it had determined not to modify the rule, and it made available the record construing the data and analyses that the EPA had generated in response to the comments. The petitioners alleged that those procedures violated their participation rights. The court disagreed, stating that "the additional material was the EPA's response to comments made during a public-comment period," and that "[n]othing prohibits the Agency from adding supporting documentation for a final rule in response to public comments." *Id.* at 1286. The court concluded that petitioners had a right to "comment on the proposed regulations, not to comment in a never-ending way on the EPA's responses to their comments." *Id.*

The instant case is distinguishable from *Rybachek.* In *Rybachek,* the added materials were the EPA's *own* responses to comments received during the public comment period. Here, in contrast, the additional documentation was submitted by the State in response to the EPA's request for further information related to the rejection of control measures. Thus, the additional materials in *Rybachek* involved the EPA's internal assessment of comments from the public; whereas, here, the new information was solicited by the EPA from an interested party.

Furthermore, in *Rybachek,* the EPA's responses related to the economic impact of the regulations on one group of miners. The additional information was not relied on or critical to the EPA's decision. Instead, the EPA decided not to alter the regulation based on the additional information it developed in response to the comments. Here, on the other hand, the added material related to the Implementation Plan's compliance with a critical statutory provision. Control measures effectuate attainment of the NAAQS, and justifying their rejection is essential under the Clean Air Act. Petitioners should have had the opportunity to comment on the new information and data which was relied

on in the EPA's final approval of the Implementation Plan.

Although there is merit to EPA's argument that agencies are not required to review an endless cycle of comments from interested parties, the nature and extent of the additional information in this case required another round of comment and review. Petitioners were prejudiced when they did not have notice of or an opportunity to comment on the post-comment period justifications which were submitted by the State and were critical to the EPA's approval decision. Accordingly, we remand to the EPA to provide an opportunity for public comment on the justifications submitted by the State in December 1994.

### B. EPA's Finding of Annual Reductions in PM–10 Emissions

The Clean Air Act requires nonattainment area Implementation Plans to provide for "reasonable further progress." 42 U.S.C. § 7502(c)(2). "Reasonable further progress" is defined as "such annual incremental reductions in emissions of the relevant air pollutant as are required ... for the purpose of ensuring attainment of the applicable" NAAQS by the applicable date. 42 U.S.C. § 7501(1).

██ Petitioners contend that EPA wrongfully approved a showing of "reasonable further progress" by granting the State 70% more emission reduction credit than the State itself was willing to claim. Specifically, the EPA recalculated the amount of emissions credit that the Implementation Plan deserved and credited substantial emission reductions in the entire nonattainment area, including rural parts of the nonattainment area. The State had not claimed credit for reductions in rural PM–10 emissions because it found that those reductions would have only minor impacts in reducing ambient PM–10 levels in the urban area, which is where the PM–10 violations occur. In substituting its own finding of "reasonable further progress," the EPA stated in the Final Rule:

> EPA disagrees with the commentator's assertion that the SIP does not demonstrate reasonable further progress in reducing PM–10 emissions. While the State's demonstration showed a small reduction in PM–10 emissions from the implementation of Maricopa County's Rule 310–Fugitive Dust, EPA believes that the emission reduction that the State associated with this rule was overly conservative.

60 Fed.Reg. 18018. The EPA viewed the State's failure to include the rural impacts as a mere oversight.

This substitution of a new "reasonable further progress" finding by the EPA constituted a failure to observe the procedure required by law and an abuse of discretion. The public did not have notice that EPA would reevaluate the State's conclusion and substitute a different finding. The demonstration of "reasonable further progress" was critical to the EPA's approval of the Implementation Plan. The EPA's evaluation did not expand on or supplement existing information. Instead, it altogether changed the prior information and findings available to the public. Furthermore, the accuracy of the information was obviously in question because the State and the EPA found different amounts of reduction. Therefore, the "opportunity for public comment [wa]s particularly crucial." *See Idaho Farm Bureau,* 58 F.3d at 1403. Therefore, we remand to EPA to provide an opportunity for public comment on the "reasonable further progress" demonstration.

### C. Approval of Measures from the 1993 Carbon Monoxide and Ozone Implementation Plans

██ Petitioners contend that the inclusion of 41 measures from the 1993 Carbon Monoxide and Ozone Implementation Plans as "reasonably available control measures" for PM–10 was impermissible because: 1) the EPA included them of its own volition; and 2) the EPA's notice of proposed rulemaking did not formally propose to add these measures to the PM–10 Implementation Plan. As a consequence, Petitioners argue that members of the public did not have the opportunity to comment on the measures' inclusion.

EPA submits that it did in fact adequately give notice of its proposal to include the contested measures in the PM–10 Implemen-

tation Plan. When addressing "reasonably available control measures" in its Proposed Rule, EPA stated:

[T]he SIP revision includes 58 measures developed by [the Maricopa Association of Government (MAG)] for the 1988 MAG particulate plan (MAG Measures).... These MAG measures include those designed specifically to reduce particulate matter emissions, as well as those developed for MAG's 1987 carbon monoxide SIP revision that could also reduce particulate matter emissions.

. . . . .

Of the remaining 62 measures submitted during the public comment period, ... 9 measures were to be addressed in the State's 1993 SIP revisions for carbon monoxide and ozone.

. . . . .

43 of the MAG measures were specifically adopted for the State's 1987 carbon monoxide (CO) SIP.... These CO measures are included in the PM–10 SIP revision because they could also reduce particulate matter emissions.... Many of these measures are transportation control measures (TCMs)....

59 Fed.Reg. 38402, 38404 (July 28, 1994).

We agree with EPA that the Proposed Rule gave adequate notice that if measures from the other implementation plans also reduced PM–10 emissions, they would be included in the PM–10 Implementation Plan. Clearly, this would include measures from later versions or revisions of the 1987 Implementation Plans, such as the 1993 Carbon Monoxide Implementation Plan. Accordingly, Petitioners were not denied their opportunity to comment on those provisions. Therefore, the inclusion of control measures from the 1993 Carbon Monoxide and Ozone Implementation Plans did not violate the APA.

### III

### Fees and Costs of Litigation

The Clean Air Act authorizes a court to "award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appro-

priate." 42 U.S.C. § 7607(f). Accordingly, we award Petitioners the costs and fees related to this appeal. The determination of an appropriate amount of fees on appeal is referred to the court's special master, Appellate Commissioner Peter L. Shaw, who shall conduct whatever proceedings he deems appropriate, and who shall have authority to enter an order awarding fees. *See* Introduction to Ninth Circuit Rules § C(2); 9th Cir. Gen. Orders 1.8, 6.3(e), 6.10.

### CONCLUSION

In sum, we: 1) remand to EPA and require the State to submit a separate demonstration of the implementation of all "reasonably available control measures" targeting the 24–hour standard violations; attainment or the impracticability of attainment for the 24–hour standard; and "reasonable further progress" for the 24–hour standard; 2) remand this case to EPA to provide for an opportunity for public comment on the post-comment period justifications for rejecting control measures and on the "reasonable further progress" demonstration; and 3) award costs and fees to Petitioners.

**Petition granted in part and denied in part.**