Edward M. OBER;  Robin D. Silver; David Matusow;  Sandra L. Bahr, Petitioners,

v.

Christine Todd WHITMAN;* United States Environmental Protection Agency, Respondents.

No. 98–71158.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 2000

Submission Withdrawn July 7, 2000

Resubmitted Aug. 22, 2000

Filed March 23, 2001

---

* Christine Todd Whitman is substituted for her predecessor, Carol Browner, as Administrator of the Environmental Protection Agency. Fed. R.App. P. 43(c)(2).

Jennifer B. Anderson, Arizona Center for Law in the Public Interest, Phoenix, Arizona, for the petitioners.

Karen Egbert, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the respondents.

Before: BOOCHEVER, BRUNETTI and THOMAS, Circuit Judges.

BOOCHEVER, Circuit Judge:

Edward Ober and other residents of Phoenix, Arizona, appeal from the Environmental Protection Agency's adoption of a federal implementation plan for the Phoenix area under the Clean Air Act. Ober claims that the plan violates the Clean Air Act because it fails to adopt controls for sources of airborne particulate pollution that the agency labels "de minimis."

## BACKGROUND

The attempts by the Environmental Protection Agency ("EPA") to formulate a plan to control air pollution in the Phoenix area pursuant to the Clean Air Act, 42 U.S.C. § 7401 et seq., have been the source of much litigation and administrative revision. Five years ago, this court reversed EPA's approval of Arizona's state implementation plan for the area. *Ober v. EPA,* 84 F.3d 304 (9th Cir.1996) ("*Ober I*"). On remand, EPA adopted a federal implementation plan for the Phoenix area. In this appeal, Phoenix citizens, including asthma sufferers who are particularly sensitive to particulate pollution, challenge EPA's failure to require controls on

sources of particulate pollution that EPA labels "de minimis."

Under the Clean Air Act, EPA has identified airborne particulate matter under ten microns in size, known as "PM–10," as a pollutant to be regulated under state and federal programs. EPA promulgated two national ambient air quality standards ("NAAQS") for PM–10 pollution, an annual standard and a 24–hour standard. *See Ober I,* 84 F.3d at 306; 40 C.F.R. § 50.6. Each state must submit to EPA a state implementation plan to comply with the NAAQS; if EPA disapproves the state plan, EPA formulates a federal implementation plan for the area. *See* 42 U.S.C. §§ 7410(C), 7509.

An area that does not meet the national ambient air quality standards for PM–10 is classified as either a "moderate" or "serious" "nonattainment area."[1] Phoenix did not meet the standards. Under the 1990 amendments to the Act, Phoenix was classified as a moderate nonattainment area required to attain the NAAQS, with a deadline of December 31, 1994. The Act requires each state that contains areas with moderate levels of PM–10 pollution to submit a state implementation plan ("SIP"), describing "reasonably available control measures" to bring the PM–10 pollution within the national ambient air quality standards "as expeditiously as practicable," within a deadline set at the time the area is designated as moderate. 42 U.S.C. §§ 7502(c)(1), 7513, 7513a(a)(1)(C). If the state implementation plan cannot show attainment of the NAAQS by the deadline, it must demonstrate that attainment by that date is "impracticable," and EPA may reclassify the area as a serious nonattainment area. 42 U.S.C. § 7513a(a)(1)(B)(ii); (b)(2).

The state of Arizona submitted to EPA its SIP for Phoenix, in which it stated that it would be impracticable to attain the

1. 42 U.S.C. § 7407(d)(1)(A) requires the governor of each state to designate each air quality region in the state. A nonattainment area does not meet the NAAQS, or contributes to

the ambient air quality in a nearby area that does not meet the NAAQS. An attainment area meets the NAAQS.

national standard for annual PM–10 pollution by the deadline. EPA approved the plan in 1995. Under the Act, because the SIP stated that attaining the PM–10 standard would be impracticable, Phoenix was reclassified in June, 1995 from a moderate to a serious nonattainment area for PM–10. *Ober I,* 84 F.3d at 307. The state was still required to submit a moderate area plan, however. *Id.* at 311 n. 2.

In *Ober I,* we reversed EPA's approval of Arizona's state implementation plan for reasons not at issue here, and remanded so that EPA could consider a revised SIP. *Id.* at 316. On remand, EPA directed the state to revise the SIP, and in 1997 EPA disapproved the revised state plan. Under the Act, because EPA did not approve the state plan, the agency had a duty to promulgate a federal implementation plan ("FIP") for the Phoenix area to meet all the requirements that the disapproved SIP failed to satisfy. *See* 42 U.S.C. §§ 7410(c)(1)(B), 7602(y).

EPA proposed the FIP in April 1998, and after public comment adopted a final federal plan in August 1998. The FIP concluded that attainment of the Clean Air Act standards for PM–10 by the statutory deadline of December 31, 2001 was "impracticable." *See* 42 U.S.C. § 7513(c)(2) (setting attainment deadline of December 31, 2001 for area designated as serious for PM–10). The FIP exempted from control a variety of sources of PM–10 pollution that EPA considered "de minimis."

Ober filed a petition for review of final agency action in this court under 42 U.S.C. § 7607(b)(1). At issue is whether EPA acted arbitrarily and capriciously by exempting from control measures sources of PM–10 pollution it considered "de minimis."

## ANALYSIS

■ This court reviews the final administrative actions of EPA pursuant to the Clean Air Act under the standard set forth in the Administrative Procedure Act. We reverse an EPA decision "only if it is arbitrary, capricious, or contrary to law or if it exceeds the statutory jurisdiction, authority, or limitations." *Exxon Mobil Corp. v. EPA,* 217 F.3d 1246, 1248 (9th Cir.2000). We review EPA's interpretation of the Clean Air Act by asking whether Congress' intent is clear, and if it is not, whether EPA's interpretation is permissible. *See id.* (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

The FIP stated that it was "impracticable" to attain the national ambient air quality standards ("NAAQS") for PM–10 particulate pollution by the deadline. EPA made this "impracticability" determination while proposing no controls at all for some of the sources of PM–10 pollution which it labeled "de minimis" sources. EPA concluded that, because these sources were "de minimis," there were no reasonably available control measures to reduce the PM–10 pollution these sources generated. It is that equation that is before us in this appeal. We must determine whether the Clean Air Act allows EPA to make de minimis exemptions, and, if so, whether EPA acted reasonably in designating some sources of PM–10 pollution as de minimis.

### A. *De Minimis Exemptions Under Clean Air Act*

■ The first question is whether, under the Clean Air Act, EPA has the power to exempt "de minimis" sources of pollution from controls.

The Act requires that a plan to reduce air pollution in a moderate nonattainment area (such as the plan required in this case) must include either "reasonably available control measures" ("RACM") to bring the PM–10 pollution levels within national standards by a specified deadline, or "a demonstration that attainment by such date is impracticable." 42 U.S.C. § 7513a(a)(1)(B)-(C). The Act makes no explicit provision for a "de minimis" exception.

EPA issued a "General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990" in April 1992. The Preamble, in describing how a moderate area plan should identify RACM for PM–10 pollution, states:

If it can be shown that one or more measures are unreasonable because emissions from the sources affected are insignificant (i.e., de minimis), those measures may be excluded from further consideration as they would not represent RACM for that area.

57 Fed.Reg. at 13,498, 13,540. An accompanying footnote explains:

Where the sources affected by a particular measure contribute only negligibly to ambient concentrations that exceed the NAAQS, EPA's policy is that it would be unreasonable and therefore would not constitute RACM to require controls on the source. In this regard, it is worth noting that the inherent authority of administrative agencies to exempt de minimis situations has been recognized in contexts such as this where an agency is invoking a de minimis exemption as "a tool to be used in implementing the legislative design."

*Id.* at 13,541 (quoting *Alabama Power Co. v. Costle,* 636 F.2d 323, 360 (D.C.Cir.1979)). Although the Preamble assumes that de minimis levels of PM–10 can be exempted from controls in moderate nonattainment areas, it does not establish thresholds for de minimis sources.

In *Alabama Power,* the District of Columbia Circuit held that EPA could exempt de minimis sources of air pollution from the requirements of the Clean Air Act:

Categorical exemptions may ... be permissible as an exercise of agency power, inherent in most statutory schemes, to overlook circumstances that in context may fairly be considered *de minimis.* It is commonplace, of course, that the law does not concern itself with trifling matters, and this principle has often found application in the administrative context. Courts should be reluctant to apply the literal terms of a statute to mandate pointless expenditures of effort.... The ability ... to exempt *de minimis* situations from a statutory command is not an ability to depart from the statute, but rather a tool to be used in implementing the legislative design.

636 F.2d at 360 (emphasis added); *see Industrial Union Dept., AFL–CIO v. American Petroleum Inst.,* 448 U.S. 607, 663–64, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (under Occupational Health and Safety Act, de minimis exemption appropriate when "administrative record reveals only scant or minimal risk of material health impairment") (Burger, C.J., concurring) (citing *Alabama Power*).

This court has not explicitly held that the Clean Air Act is subject to de minimis exemptions. We have, however, implicitly approved EPA's power to make appropriate de minimis exemptions to the Act. In *Western States Petroleum Ass'n v. EPA,* 87 F.3d 280, 283–85 (9th Cir.1996), we analyzed Clean Air Act regulations which explicitly allow state programs to exclude insignificant activities and emissions from permit applications, and reversed an EPA decision disapproving a state permit program which exempted such insignificant activities.

Courts have refused to allow de minimis exemptions where the statutory language does not allow it. *See, e.g., United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2d Cir.1993) (because Comprehensive Environmental Response, Compensation and Liability Act of 1980 draws no distinctions based on quantity, even party contributing minimal amount of hazardous substance is liable); *Public Citizen v. Young,* 831 F.2d 1108, 1113 (D.C.Cir.1987) ("rigid" language of Color Additive Amendment does not allow application of de minimis exemption). There is no explicit provision in the Clean Air Act prohibiting the exemption from controls for de minimis sources of PM–10 pollution. Nor is the statutory language uncompromisingly rigid. The Act provides that a plan

must include "reasonably" available control measures to bring an area within national standards unless attainment is "impracticable." Those terms allow for the exercise of agency judgment. *See Environmental Defense Fund, Inc. v. EPA,* 82 F.3d 451, 466 (D.C.Cir.1996) (per curiam) (de minimis exemption cannot stand if it is contrary to express terms in statute, but unless Congress "has been extraordinarily rigid in drafting the statute," de minimis exemption is allowed for regulation yielding trivial gain). We conclude that EPA, in discharging its duty to enforce the Act, is permitted under *Chevron* to exempt de minimis sources of PM–10 from pollution controls.

### B. *The selection of de minimis levels*

■ Although EPA has the authority to exempt de minimis sources of PM–10, the selection of de minimis levels does not escape judicial scrutiny. We review a challenged de minimis exemption to determine whether the agency action is permissible. "[U]nless [EPA] describes the standard under which [it] has arrived at this conclusion, supported by a plausible explanation, we have no basis for exercising our responsibility to determine whether [EPA's] decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." *American Lung Ass'n v. EPA,* 134 F.3d 388, 392–93 (D.C.Cir.1998) (citations and quotations omitted); *see Southwestern Penn. Growth Alliance v. Browner,* 121 F.3d 106, 117 (3d Cir.1997) (record must demonstrate that agency has examined relevant data and articulated satisfactory explanation, rationally connecting facts found and choice made). EPA must cite information to explain why it exempted certain sources as de minimis, and "[w]ithout data ... we owe no deference to EPA's line-drawing." *National Resources Defense Council, Inc. v. EPA,* 966 F.2d 1292, 1306 (9th Cir.1992).

■ We therefore defer to the agency's judgment only if EPA has provided a full explanation of its de minimis levels and its application of those levels to sources of pollution.[2] Once we have received that explanation, however, we owe deference to the agency's decision if it is a permissible interpretation of the statute. *See Environmental Defense Fund,* 82 F.3d at 467.

### 1. *EPA's Rationale*

■ EPA designated as a de minimis source of PM–10 pollution in the Phoenix area any source that contributed less than one microgram per cubic meter of PM–10 to a location of expected annual exceedences, and less than five micrograms per cubic meter to a location of expected 24–hour standard exceedences. (To be considered de minimis, a source's PM–10 contribution had to contribute less than the amounts specified for both the annual and 24–hour standards.)

EPA eventually designated thirteen source categories as de minimis: industrial yards, surface mining, other industrial activities, fuel combustion, charbroiling, residential wood combustion, paved parking lots, locomotives, gasoline-powered on-road motor vehicles, diesel-powered on-road motor vehicles, airport ground support, major point sources, and other area sources (e.g. open burning, structural fires). Of these thirteen source categories, only four were unregulated in the FIP, either because the remaining nine were already controlled by existing control measures, or because no reasonably available control measures existed. The four sources of PM–10 unregulated as de minimis were gas on-road motor vehicles, diesel on-road motor vehicles, locomotives, and airport ground support.

EPA adopted the de minimis thresholds from the federal new source review program for issuing permits to new stationary sources of pollution, including PM–10. *See*

---

**2.** To aid us in evaluating EPA's selection of the de minimis levels in this case, and to provide us with the data EPA is required to submit to justify its action, we asked for and received supplemental briefing from the parties.

40 C.F.R. 51.165(b). The new source review program applies to new sources of PM–10 pollution located in attainment areas. The de minimis levels in the program, however, were keyed to the new sources' impact in nearby nonattainment areas. Ober challenges the use of the new source de minimis levels to establish de minimis thresholds in Phoenix's FIP.

In 1987, when EPA adopted the de minimis levels for the new source review program, the agency explained that the purpose of the thresholds was to enable the states "to determine whether the modeled ambient impact of a new source or modification would significantly affect the air quality." 52 Fed.Reg. 24672, 24706 (1987). If the impact of a new source on PM–10 levels in a nonattainment area was below the specified thresholds, the impact was deemed insignificant, and no controls were required, because "the source's impact would not be sufficient to cause or contribute to a NAAQS violation." *Id.* EPA would be required to make sure that the accumulated de minimis exemptions did not push the PM–10 levels in an area over the NAAQS. *Id.* at 24707.

EPA concluded that the de minimis levels for new sources of PM–10 would be applied to existing sources of PM–10 (such as those in this case) in 1994, relying on the inherent agency authority as described in *Alabama Power:*

> [EPA] has the authority to exempt from regulation those source categories in the area which contribute only negligibly to ambient concentrations which exceed the NAAQS. The EPA believes the court's test for invoking the de minimis exemption authority would be satisfied in circumstances where a State demonstrates conclusively that, because of the small contribution of the source category's emissions to the nonattainment problem, the imposition of additional controls ... on a particular source category in the area would not contribute significantly to the Act's purpose of achieving attain-

ment of the NAAQS "as expeditiously as practicable."

59 Fed.Reg. 41998, 42011 (1994).

EPA thus concluded that it "will, in general, rely on the criteria applied under new source permitting programs (40 C.F.R. 51.165(b)) to determine when a source category contributes significantly to violations of the NAAQS in a PM–10 serious nonattainment area." *Id.*[3] The agency categorized PM–10 pollution levels that were de minimis when generated by a new source of pollution as also de minimis when the pollution was generated by existing sources, such as the thirteen PM–10 sources considered de minimis in the Phoenix area.

EPA also concluded that it would be inappropriate to apply these de minimis standards automatically to every area that does not meet national air quality standards. Sources of de minimis amounts of PM–10 pollution would escape regulation only if the failure to regulate them would have "little benefit" on the affected area's air quality. EPA thus would decline to regulate de minimis sources of PM–10 only if the cumulative effect of controlling the pollution would not make the difference between attaining and not attaining clean air (the NAAQS) by the deadline set by the statute, December 31, 2000. *See* 42 U.S.C. § 7513(c)(2); 63 Fed.Reg. 15920, 15927 (de minimis categories cannot escape controls "if such controls are needed for attainment").

### 2. *Ober's Objections to EPA's Rationale*

Ober objects to these agency conclusions. First, Ober rejects the agency's adoption of the de minimis levels from the new source program. Second, Ober argues that EPA's data is insufficient because EPA did not specify how much of a public health hazard is caused by each de minimis source of PM–10 pollution, or by

---

**3.** Although this guidance applies to serious nonattainment areas, EPA applied these numerical thresholds to the moderate plan at issue here.

the collective pollution generated by all the de minimis sources. Third, Ober contends EPA improperly focused "only on the deadline and not on the relative benefit to the area's air quality" when it exempted de minimis sources from controls. Ober maintains that EPA should require controls on de minimis sources even if the controls would not make the difference between timely attainment and nonattainment. We address each objection in turn.

### New source thresholds

■ When EPA adopted the PM–10 de minimis standards for the new source program, it codified those levels in a regulation after accepting and considering public comment. *See* 40 C.F.R. § 51.165(b); 52 Fed.Reg. 24672, 24705–07. EPA argues that the new source de minimis standards in place since 1987 were still appropriate seven years later, when in 1994 the agency stated its intention to use them for existing sources. Ober does not challenge EPA's establishment of these de minimis levels for the new source review program in 1987. Instead, Ober suggests that de minimis thresholds adopted by EPA for new sources of pollution are somehow inappropriate when those same de minimis thresholds are adopted for existing sources of pollution.

We see no evidence in the record that the de minimis levels should be different when the PM–10 pollution is caused by existing sources in the area, rather than by new sources located elsewhere. The new source program requires permits for sources of PM–10 pollution located outside nonattainment areas. But its de minimis levels are keyed to the source's impact on the air quality in nonattainment areas, reflecting the projected amount of PM–10 pollution the new source will cause there. The de minimis thresholds in both the new source review program and in this case, therefore, are based on the source's contribution to the pollution in nonattainment areas. We conclude that it was permissible for EPA to adopt the PM–10 de minimis thresholds already in place in the new source review program.

### Public health

Ober faults EPA for not describing the precise public health effect of each of these small amounts of PM–10 pollution, as well as the effect of the collective pollution generated by all the de minimis sources. Because EPA's mandate is to protect the public health, Ober argues, it must specifically address the public health impact of exempting these sources from controls.

■ EPA is engaged in promulgating a federal implementation plan for Phoenix to bring the area into conformity with the NAAQS, defined by the statute as "ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator ... are requisite to protect the public health." 42 U.S.C. § 7409(b)(1). Congress required that "NAAQS must protect not only average healthy individuals, but also 'sensitive citizens'-children, for example, or people with asthma, emphysema, or other conditions rendering them particularly vulnerable to air pollution." *American Lung Ass'n*, 134 F.3d at 389. By definition, then, a source of pollution that has only a de minimis effect on the effort to bring Phoenix in conformity with these air quality standards has only a de minimis effect on the public health, as the NAAQS themselves are set to protect the public health. Because the NAAQS are public health standards, we do not believe that EPA was required to analyze more specifically the effect of the de minimis sources on the public health, under the circumstances presented by this case.

### Attainment deadlines

■ Ober also claims that EPA's additional criterion for declaring a source de minimis, evaluating whether control of that source would result in attainment of the NAAQS by the deadline, was arbitrary.

EPA explains that after the FIP adopted the de minimis levels and identified existing sources that produced PM–10 pollution below those levels, the plan pro-

posed not to regulate those de minimis sources if doing so would not bring the Phoenix area into compliance with NAAQS. In other words, EPA acknowledges that even the small amounts of pollution generated by a de minimis source or sources would be controlled, if such control served the goal of attaining clean air by the deadline.

Requiring controls on de minimis sources if NAAQS will be met by the deadline serves to limit, not expand, the exemption of de minimis sources from controls. Further, using the deadline to determine whether controls must be imposed makes sense. The deadline is not an arbitrary date unrelated to air quality concerns. All the schedules and timetables for control of air pollution are keyed to the statutory deadline, which is a fundamental part of the federal implementation plan meant to ensure that national clean air standards are achieved as expeditiously as practicable. *See Natural Resources Defense Council v. Browner*, 57 F.3d 1122, 1127 (D.C.Cir.1995) (describing incremental deadlines in Clean Air Act as intended to speed the attainment of clean air standards). EPA's mandate is to formulate "implementation plans [that] provide for the attainment of the NAAQS as expeditiously as *practicable*," *Ober I*, 84 F.3d at 309 (emphasis added), but no later than the deadline of December 31, 2001.

In this case, the FIP concludes that the deadline will not be met even if these small sources of PM–10 were controlled. Under those circumstances, it is reasonable to decline to control the de minimis sources of pollution. *See, e.g., Environmental Defense Fund*, 82 F.3d at 466 (de minimis exemptions permissible where "it seems eminently reasonable" for EPA to interpret Clean Air Act to require federal government to curtail only nonconforming activity "that is likely to interfere with the attainment goals in a [state implementation plan]").

Ober characterizes the use of the attainment deadline as a measure of whether EPA will require controls on a de minimis source as fundamentally flawed, because it might result in unreasonably high de minimis thresholds. Ober posits that where air quality is at its worst, large amounts of pollution might remain unregulated as de minimis, because the area is so far from attainment by the deadline.

But EPA has not adopted an elastic ceiling for PM–10 de minimis levels. The de minimis threshold is set at, and will not exceed, one microgram per cubic meter for the annual standard, and five micrograms per cubic meter for the 24–hour standard, regardless of the general air quality level. EPA does, however, retain the flexibility to regulate amounts of PM–10 pollution that are even *smaller* than the de minimis levels, if their control would mean attainment by the deadline. This is a result Ober presumably would applaud.[4]

We conclude that EPA acted permissibly in considering attainment deadlines in deciding whether to require controls on de minimis sources of PM–10 pollution.

## CONCLUSION

We hold that EPA has the power to make de minimis exemptions to controls under the 1990 amendments to the Clean Air Act. We also hold, based on EPA's explanation of its actions, that it was permissible for EPA to adopt the de minimis levels for PM–10 pollution from the new source review program. The petition for review is denied.

---

4. Ober also posits a situation in which the cumulative effect of a large number of de minimis sources of PM–10 pollution would have a large impact on pollution levels in the area. Under those circumstances, Ober argues that it would not be permissible for EPA to exempt those de minimis sources from controls simply because their control would not attain the national air quality standards by the deadline. We do not face that situation here, however, and we do not speculate how EPA would behave in such a case.