Revised December 31, 2002

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 01-60537

---

SIERRA CLUB, CLEAN AIR AND WATER INC; COMMUNITY IN-POWERMENT
DEVELOPMENT ASSOCIATION,

Petitioner,

VERSUS

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; CHRISTINE T.
WHITMAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY,

Respondents.

---

Petition for Review of an Order of the
Environmental Protection Agency

---

December 11, 2002

Before DeMOSS, STEWART, and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:

Sierra Club, Inc., Clean Air and Water, Inc., and Community In-Powerment Association (collectively the "Petitioners"), are appealing the Environmental Protection Agency's (EPA) final action at **66 Fed. Reg. 26,914** (May 15, 2001) (codified at 40 C.F.R. pt. 52), which they contend contravenes the Clean Air Act (CAA), **42**

**U.S.C. §§ 7401-7671q.** The final action approved the State Implementation Plan (SIP) submitted by the State of Texas for the Beaumont-Port Arthur (Beaumont) area and extended the ozone attainment deadline for that area. Petitioners also are appealing the EPA's determination that no additional control measures were required in the Beaumont area to satisfy the statutory requirement for implementation of Reasonably Available Control Measures (RACM). The EPA's final action is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Regulatory Background.

The CAA establishes a comprehensive program for improving air quality throughout the nation. Under the CAA, the EPA is charged with identifying air pollutants that endanger the public health and welfare. *Id.* § 7408. The EPA also is charged with formulating National Ambient Air Quality Standards (NAAQS), which specify those pollutants' maximum permissible concentrations in the ambient air. *Id.* § 7409. In 1979, the EPA promulgated a one-hour NAAQS for ozone, which still remains at 0.12 parts per million based on a one-hour average. *See* **40 C.F.R. § 50.9.**

Under the CAA, states must adopt SIPs specifying emission limitations applicable to pollution sources in order to maintain and enforce each NAAQS. **42 U.S.C. § 7410(a).** SIPs are submitted to the EPA, which may approve, conditionally approve, or disapprove

2

the SIPs in full or in part. *Id.* § 7410(k). Significantly, the CAA has a provision that requires SIPs to contain provisions regulating emissions that "contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." *Id.* § 7410(a)(2)(D)(i)(I). In addition, as noted in the challenged final action, the EPA has interpreted 42 U.S.C. § 7410(a)(2)(A) as incorporating a similar requirement that an upwind area be prohibited from contributing significantly to nonattainment in a downwind area within the same state. *See* **66 Fed. Reg. 26,917.**

Under 42 U.S.C. § 7511a, ozone attainment areas are classified according to the severity of air pollution. The classifications are: "marginal," "moderate," "serious," "severe," or "extreme." **42 U.S.C. § 7511a(a)-(e).** Each classification has a specified date for attainment of the ozone NAAQS and the programs that States must adopt in their SIPs to attain the NAAQS by reducing emissions of volatile organic compounds and nitrogen oxides, which are precursors to the formation of ozone. *Id.* §§ 7511, 7511a-7511d. Under the CAA, the following dates were established for the NAAQS to be achieved: (1) November 15, 1993, for marginal areas; (2) November 15, 1996, for moderate areas; (3) November 15, 1999, for serious areas; (4) November 15, 2005, for severe areas; (5)

3

November 15, 2007, for severe-17 areas;[1] and (6) November 15, 2010, for extreme areas. *Id.* § 7511(a)(1). Under section 7511(a)(5), the State may apply for two one-year attainment date extensions that the EPA can approve if it makes specific determinations regarding air quality and state compliance with SIP requirements.

In addition, all nonattainment area plans must provide for implementation of "all reasonably available control measures [RACM] as expeditiously as practicable." *Id.* § 7502(c)(1). The EPA must review each submitted plan. ***Id.* § 7410(k).** If the plan is approved, in whole or in part, the approved provisions become federally enforceable. *Id.* §§ 7413, 7604. If the plan is not approved, or is determined to be incomplete, the State may be subject to sanctions and eventually federally imposed clean air measures. *Id.* §§ 7410(c), 7509.

**B.   The Extension Policy at Issue in this Case.**

On March 25, 1999, the EPA issued a notice of interpretation of the CAA entitled "Extension of Attainment Dates for Downwind Transport Areas." **64 Fed. Reg. 14,441** (Mar. 25, 1999). In this extension policy, the EPA interpreted the CAA as allowing for the extension of attainment dates for ozone nonattainment areas classified as either "moderate" or "serious" and that are downwind

---

[1]Notwithstanding table 1 in 42 U.S.C. § 7511(a)(1), severe-17 areas have a 1988 ozone design value between 0.190 and 0.280 ppm, which provides these areas with a different attainment date than "severe" areas. *See id.* § 7511(a)(2).

of areas that transport ozone and interfere with their ability to attain required ozone levels.  *Id.* at 14,441-42.  According to the EPA, it was seeking to "harmonize the attainment demonstration and attainment date requirements for downwind areas affected by transport both with the graduated attainment date scheme and the schedule for achieving reductions in emissions from upwind areas."  *Id.* at 14,443.

In the extension policy, the EPA explained that an area's attainment date would be considered for extension if it:  (1) has been identified as a downwind area "affected by transport from either an upwind area in the same State with a later attainment date or an upwind area in another State that significantly contributes to downwind nonattainment"; (2) has submitted an approvable attainment demonstration with any "necessary, adopted local measures," which indicates it will attain the one-hour NAAQS "no later than the date that the reductions are expected from upwind areas under the final [nitrogen oxides] SIP Call and/or the statutory attainment date for upwind nonattainment areas"; (3) has adopted "all applicable local measures required under the area's current classification and any additional measures necessary to demonstrate attainment," given that the reductions occurred as required in upwind areas; and (4) will "implement all adopted measures as expeditiously as practicable, but no later than the date by which the upwind reductions needed for attainment will be

5

achieved." *Id.*

If an area satisfies the above guidelines, it would not be reclassified or "bumped-up" if it failed to attain by its original attainment date under section 7511(b)(2). The reasoning for this is that the EPA concluded that Congress did not intend for downwind areas to be "penalized by being forced to compensate for transported pollution by adopting measures that are more costly and onerous and/or which will become superfluous once upwind areas reduce their contribution to the pollution problem." *Id.* at 14,444. Nevertheless, downwind areas are still responsible for implementing local controls sufficient to bring about attainment, except for the transported pollution. *Id.*

## C.   EPA's Application of the Extension Policy to the Beaumont Area.

The Beaumont area is classified as a moderate ozone nonattainment area. *See* **40 C.F.R. § 81.344.** Therefore, under 42 U.S.C. § 7511(a)(1), its original attainment date was November 15, 1996. However, as a result of the pollution traveling from the upwind area of Houston/Galveston, the EPA applied its extension policy that resulted in a new attainment date of November 15, 2007, for the Beaumont area. This date coincides with the Houston/Galveston area's November 15, 2007, attainment date. **66 Fed. Reg. 26,914.** The EPA established the new attainment date for the Beaumont area after concluding that, based on extensive modeling submitted by the State of Texas, it will not reach the

6

required attainment level unless the Houston/Galveston area also attains necessary ozone standards. *Id.* at 26,915-23. In other words, requiring local reductions in the Beaumont area earlier than the Houston/Galveston area's attainment date would not accelerate attainment in the Beaumont area because of the Houston/Galveston area's pollution contributions and the need for upwind emissions reductions.

Petitioners now appeal the EPA's application of the extension policy to the Beaumont area. Petitioners also appeal the EPA's determination that 42 U.S.C. § 7502(c)(1) does not compel the implementation of any additional control measures beyond those already contained in the Beaumont area's attainment demonstration SIP.

## II.  STANDARD OF REVIEW

This Court's role in reviewing the adequacy of the EPA's final action is governed by the Administrative Procedure Act, **5 U.S.C. § 706.** Section 706(2) provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be--(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See also **Texas Office of Pub. Util. Counsel v. Federal Communications Comm'n,*** 265 F.3d 313, 320 (5th Cir. 2001); ***Macktal v. United States Dep't of Labor,*** 171 F.3d 323, 326 (5th Cir. 1999).

## III.  DISCUSSION

**A. Whether the EPA acted consistently with the CAA in granting an extension of the statutory date for meeting federal standards for ozone air pollution in the Beaumont area and in approving a SIP for the area based on that extension.**

The EPA argues that it did not abuse its authority by implementing its extension policy. The EPA asserts that its interpretation of the CAA is the best way to reconcile the Act's provisions. According to the EPA, when considering all of the CAA's pertinent language, Congress clearly did not intend the unduly restrictive and punitive reading that Petitioners urge on this Court. The EPA argues that its interpretation of the CAA was necessary to fill a statutory gap to avoid unfairly burdening downwind areas by forcing them to adopt more stringent local controls for the purpose of compensating for another area's transported pollution.

In support of its argument, the EPA notes that Congress has provided extensions to transport-affected nonattainment areas such as in cases of international border areas under section 7509a, which spares ozone nonattainment areas that demonstrate they suffer from pollution from "outside of the United States" from being bumped-up to a higher ozone classification. Under section 7511a(h), the CAA authorizes the EPA to designate certain isolated ozone nonattainment areas as "rural transport areas," which allows them to be subjected to less stringent control requirements. In addition, 42 U.S.C. § 7511a(j)(2) provides that when a multi-state nonattainment area fails to demonstrate attainment by the

8

applicable deadline, a State within that area may be relieved of statutory sanctions if "the State would have been able to make such demonstration but for the failure of one or more other States" within the control area. Section 7511(a)(4) of the United States Code authorizes the adjustment of an area's original classification based on factors including transported pollution. Furthermore, under 42 U.S.C. § 7410(a)(2)(D)(i)(I), SIPs must contain adequate provisions prohibiting pollution that "contribute[s] significantly to nonattainment in . . . any other State." And, section 7426 provides States the opportunity to petition the EPA for relief from interstate pollution.

The EPA concedes that when the 1990 amendments to the CAA were passed, Congress did not expressly specify similar relief for other areas, including for downwind cities that are unable to achieve attainment as a result of upwind cities within the same State. The EPA, however, maintains that Congress did not fully address all issues of ozone transport at the time the CAA was amended in 1990 because there was a lack of understanding concerning the issue. According to the EPA, it was not until the mid-1990s that a sufficient understanding of the complex ozone transport problem began to be achieved as a result of the Ozone Transport Assessment Group (OTAG), an organization with the mission to assess and recommend strategies to address ozone transport. Thus, the EPA insists that a reasonable understanding of ozone transport was not achieved until well after the Beaumont area's 1996 attainment

9

deadline. Ultimately, the EPA asserts that it was reasonable for it to conclude that the Houston/Galveston area's impact on the Beaumont area's ability to attain the one-hour ozone standard indicated that the CAA's transport and attainment provisions did not function as Congress envisioned.

Petitioners, however, contend the EPA abused its authority by defeating the express statutory reclassification requirements of the CAA and extending the ozone attainment deadlines for the Beaumont area based on pollution transport, and by approving the SIP as adequate based on the extension. According to Petitioners, because the Beaumont area failed to achieve attainment of required ozone levels, it should have been reclassified from "moderate" (with an attainment date of November 15, 1996) to either "serious" (with an attainment date of November 15, 1999) or "severe" (with an attainment date of November 15, 2005). *See* 42 U.S.C. § 7511a. Petitioners further maintain that under the CAA, reclassification would require that an incremental increase in the mandatory control strategies be imposed on the Beaumont area's SIP in exchange for any extended attainment date. *See* 42 U.S.C. §§ 7511a(1)-(d) and 7511(b)(2)(A)).

This Court is guided by *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842-44 (1984), in evaluating the EPA's interpretation of the CAA. The first step under *Chevron* is to inquire whether Congress "has directly spoken to the precise question at issue."

***Id.*** at 842-43. If Congress has spoken to the issue, this Court "must give effect to the unambiguously expressed intent of Congress" and "that is the end of the matter." ***Id.*** However, if the statute is "silent or ambiguous with respect to the specific issue," this Court must move to *Chevron*'s second step. ***Id.*** at 843. Under the second step, this Court must defer to the EPA's interpretation if it is "based on a permissible construction of the statute." ***Id.*** Furthermore, as this Court has stated, the EPA's decision will be reversed "only if it was arbitrary, capricious or manifestly contrary to the statute." ***Texas Office of Pub. Util. Counsel,*** 265 F.3d at 320 (citing *Chevron*, 467 U.S. at 844). *See also* **5 U.S.C. § 706(2).**

Petitioners correctly point out that the Supreme Court has stated: "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." ***City of Chicago v. Environmental Defense Fund,*** 511 U.S. 328, 338 (1994) (internal quotations omitted). Petitioners contend that the CAA's numerous provisions addressing the issue of pollution transport and extensions of attainment dates clearly indicates that Congress fully understood the issue at hand and intended not to authorize the EPA to extend attainment dates as it did in this case. Petitioners conclude, therefore, that under step one of *Chevron*, the question of whether an attainment date extension is permissible

11

based on air pollution transport has been resolved by the statute and "that is the end of the matter." *Chevron, 467 U.S.* at 842-43.

We agree with the Petitioners. The plain terms of the CAA preclude an extension of the sort the EPA granted in the present case. As the Petitioners correctly point out, the CAA specifies when the EPA may extend attainment deadlines to account for upwind emissions that jeopardize an area's ability to achieve attainment without requiring reclassification of the area. For example, the CAA provides:

> any State that establishes to the satisfaction of the Administrator that . . . such State would have attained the national ambient air quality standard for ozone by the applicable attainment date, but for emissions emanating from outside of the United States, shall not be subject to the provisions of section 7511(a)(2) or (5) of this title or section 7511d of this title.

42 U.S.C. § 7509a(b) (emphasis added). Furthermore, the CAA provides for certain nonattainment areas to be exempted from the attainment deadlines by authorizing the EPA to designate those areas as "rural transport areas," which allow those areas to be treated as "marginal" areas. Id. § 7511a(h). This designation, however, is limited to a transport-affected area that "does not include, and is not adjacent to, any part of a Metropolitan Statistical Area or, where one exists, a Consolidated Metropolitan Statistical Area," id. § 7511a(h)(1), and whose Oxides of Nitrogen emissions "do not make a significant contribution to the ozone concentrations measured in the area or in other areas." Id. §

12

7511a(h)(2).  As the D.C. Circuit aptly stated in a recent case similar to this one:  "We cannot but infer from the presence of these specific exemptions that the absence of any other exemption for the transport of ozone was deliberate, and the Agency's attempt to grant such a dispensation is contrary to the intent of Congress." *Sierra Club v. EPA*, 294 F.3d 155, 160 (D.C. Cir. 2002). *See also*, *Sierra Club v. EPA*, 2002 WL 31641639, at *6 (7th Cir., Nov. 25, 2002).

We note that **NRDC,** upon which the EPA heavily relies, is inapposite to the present case.  In  **NRDC,** the D.C. Circuit affirmed the EPA's grant of two deadline extensions.  The first deadline extension concerned the submission of enhanced Inspection and Maintenance (I/M) SIPs.  **NRDC,** 22 F.3d at 1135.  Under the CAA, Congress provided that States be given a one-year period after guidance promulgation to bring their SIPs into compliance with the enhanced I/M performance standard.  **Id.**  However, the EPA failed to meet its November 15, 1991, deadline for providing guidance, which "made it impossible for states both to have the benefit of this lead time and to meet their November 15, 1993, enhanced I/M submission deadline."  **Id.**  The court noted that "[w]hile the CAA is very specific about the consequences of a state's failure to meet the submittal deadline, the Act is silent on what should occur if the agency misses its guidance deadline."  **Id.**  Because Congress' statutory scheme provided that the States "comply in all

13

respects" with the EPA guidance, the court concluded that a deadline extension was necessary for the States to have a full year to do so. *Id.*

The second deadline extension in *NRDC* concerned the CAA's requirement that States encompassing nonattainment areas submit SIPs or SIP revisions addressing the application of Reasonably Available Control Technology (RACT) to stationary emission sources of nitrogen oxides by November 15, 1992. *Id.* However, the EPA concluded that photochemical grid modeling was "the only reliable tool to justify an area wide exemption from the [nitrogen oxides] requirements." *Id.* at 1136. Moreover, the EPA found that the modeling "ha[d] not been utilized previously or, if utilized, ha[d] not adequately considered the effects of [nitrogen oxides] emissions reductions." *Id.* As a result, the EPA determined that "the time needed to establish and implement a modeling protocol and to interpret the model results will, in a variety of cases, extend beyond the November 15, 1992 deadline for submission of [nitrogen oxides] rules." *Id.* Therefore, the EPA created a narrow one-year extension for nitrogen oxides RACT submissions limited to situations in which a State is able to document that "(1) credible photochemical grid modeling is not available or did not consider the effects of [nitrogen oxides] reductions and (2) the state submits progress reports on the modeling showing the program is on schedule while the committal SIP is being reviewed by EPA." *Id.*

14

When evaluating the validity of the extension, the D.C. Circuit noted that the CAA expressly gave the EPA 14 to 18 months after the submittal deadline to approve or disapprove these SIPs and to determine whether a State qualified for certain exemptions. *Id.* at 1136. The court further noted that only a single nitrogen oxides RACT submission was required under the CAA and, therefore, Congress intended all data supporting exemptions to be included with that submittal. *Id.* According to the court, after receiving a submittal, the EPA should then have had the full 14 to 18 months to review it before making an exemption determination. *Id.* The court, however, noted that in many instances the EPA would not be able to utilize the full statutory review time to make an exemption determination before the statutory deadline. Therefore, the court concluded that "had Congress foreseen the exemption timing problem, a matter outside the EPA's control, it would have elected to accord the EPA the full statutory review time." *Id.*

As discussed above, the first extension upheld by the D.C. Circuit in *NRDC* was necessary to correct a timing problem created by the EPA because it did not meet its own guidance deadline. The second extension was upheld because the EPA would not otherwise have the full review time in which to make adequate exemption determinations. Ultimately, this second extension was made necessary by the EPA's own finding that photochemical grid modeling was necessary to justify area wide exemptions. Therefore, in both

15

instances, the extensions upheld by the D.C. Circuit were made necessary by the EPA's own action or inaction, which could not have been foreseen by Congress when it enacted the 1990 revision of the CAA. Neither extension, however, had anything to do with a situation in which a nonattainment area submitted a SIP, had it approved by the EPA, implemented the SIP, and then failed to meet its attainment deadline as did the Beaumont area in this case.

**B.      Whether the EPA reasonably interpreted the CAA as not requiring any additional RACMs in the Beaumont area's SIP.**

Section 7502(c)(1) of the CAA requires that plans for nonattainment areas "shall provide for the implementation of all reasonably available control measures as expeditiously as practicable . . . and shall provide for attainment of the national primary ambient air quality standards." **42 U.S.C. § 7502(c)(1).** Petitioners contend that the EPA arbitrarily and capriciously rejected a number of control measures that are demonstrably reasonably available for use in the Beaumont area. As a result, Petitioners argue that the EPA's final action conflicts with the plain language of section 7502(c)(1).

Specifically, Petitioners assert that the EPA improperly limited the menu of RACMs to those that would advance the date of attainment. Petitioners insist the result of the EPA's action relegates the CAA's RACM mandate to mere surplusage because additional control measures that could reduce the frequency and severity of violations need not be considered. Included in the

16

RACMs that Petitioners claim have been excluded from consideration are a number of transport control measures (TCM) listed in section 7408(f) of the CAA. In addition, Petitioners contend that the EPA's determination that potential measures requiring intensive and costly implementation efforts are not RACMs. Petitioners assert that such a determination is based on vague and unintelligible standards and, therefore, is unreasonable.

The EPA acknowledges that additional control measures are available to the Beaumont area. The EPA, however, contends that the Beaumont area's attainment demonstration contained all RACMs required under the CAA. Significantly, the EPA has interpreted section 7502(c)(1) as imposing a duty to implement only those control measures that contribute to attainment as expeditiously as practicable. *See;* **57 Fed. Reg. 13,498**, 13,560 (Apr. 16, 1992) (citing **44 Fed. Reg.** at 20,375).

Furthermore, the EPA notes that it revised its guidelines concerning TCMs in its General Preamble for Implementation for the Clean Air Act Amendments of 1990 (Apr. 16, 1992) in which it concluded that "based on experience with implementing TCMs over the years, EPA now believes that local circumstances vary to such a degree from city-to-city that it is inappropriate to presume that all [section 7408(f)] measures are reasonably available in all areas." **57 Fed. Reg.** at 13,560. The EPA then concluded that only those TCMs that are determined to be "reasonably available for

17

implementation in the area in light of local circumstances" should be reviewed by the planning agency.  *Id.*

As noted above, the EPA determined that only those control measures that contribute to attainment as expeditiously as practicable are required.  This interpretation of the CAA was applied in a number of final actions before the statute was amended in 1990.  *See* **53 Fed. Reg. 30,220, 30,222** (Aug. 10, 1988); **53 Fed. Reg. 30,224, 30,234** (Aug. 10, 1988); **55 Fed. Reg. 40,658, 40,659** (Oct. 4, 1990).  When Congress amended the CAA, it moved the RACM requirement from section 7502(b)(2) to section 7502(c)(1).  At the same time, Congress created a new section to the Act that preserved all existing EPA guidance issued prior to the amendments.  *See* **42 U.S.C. § 7515.**  Therefore, we conclude that Congress intended to preserve the EPA's interpretation of the CAA regarding the RACM requirement.

Furthermore, there is persuasive authority from the Ninth Circuit to support the EPA's interpretation of the RACM requirement.  In ***Ober v. Whitman,*** the Ninth Circuit upheld the EPA's interpretation of the corresponding RACM requirements for particulate matter (PM-10) governed by section 7513a(a).  243 F.3d 1190 (9th Cir. 2001).  There, the plaintiffs challenged the exemption from control of a variety of sources of particulate pollution in a Federal Implementation Plan for the Phoenix area.

The Ninth Circuit concluded that the CAA allowed the EPA to

18

make what it called "*de minimis*" exemptions and that the agency acted permissibly in designating some pollution sources as *de minimis*. *Id.* at 1198. Notably, the court accepted the EPA's reasoning in the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990 that control measures not aiding in achieving attainment may be excluded from further consideration because they would not represent RACM for that area. *Id.* at 1194-95, 1198. The same reasoning used by the EPA in *Ober* also was used here. The EPA concluded that section 7502(c)(1) does not require the implementation of RACMs that do not aid in achieving attainment of national clean air standards as expeditiously as practicable. Implementing such RACMs would be a pointless expenditure of effort, which courts are reluctant to require. *See, e.g., Alabama Power Co. v. Costle,* 636 F.2d 323, 360 (D.C. Cir. 1980).

Similarly, the EPA need not require an analysis of all transport control measures (TCM) specifically listed in 42 U.S.C. § 7408(f). TCMs are measures taken to reduce emissions of ozone precursors emitted by transportation sources. We conclude that it would not be possible to assess all available measures and consider the effects of such measures in every possible combination, as Petitioners argue is required by the statute. Furthermore, the EPA has recognized that only some TCMs "will be reasonably available for implementation in many nonattainment areas." **57 Fed. Reg.** at

19

13,560.

Nevertheless, the EPA did conclude that it would be reasonable to use a midpoint level of program effectiveness to analyze potential reductions from TCMs, a level that would be economically feasible and provide effective implementation. *See* **66 Fed. Reg.** at 26,932. Under this program, the EPA's analysis adequately assessed all necessary TCMs for effectiveness. The result confirmed that the TCMs would not produce emission reductions sufficient to advance attainment in the Beaumont area. Therefore, it appears that the EPA properly concluded that no additional TCMs were required because they would not contribute to expeditious attainment.

Moreover, the EPA properly concluded that potential measures requiring intensive and costly implementation were not RACMs because they could not be readily implemented due to excessive administrative burden or local conditions such as high costs. *Id.* at 26,929. Such determinations based on a cost/benefit analysis are within the EPA's discretion unless the statutory scheme precludes such a determination. *See, e.g.,* **Michigan v. EPA,** 213 F.3d 663, 678-79 (D.C. Cir. 2000); *Cf.* 42 U.S.C.A. § 7409(b)(1) (prohibiting a cost/benefit analysis by preventing the EPA from considering any factor other than health effects relating to pollutants in the air in establishing NAAQS for ozone and particulate matter). We find no such limitation in the CAA.

20

Lastly, we note that the D.C. Circuit's decision in ***Sierra Club v. EPA*** also supports our rejection of the Petitioners' argument that treating as potential RACMs only those measures that would advance the date at which an area reaches attainment conflicts with the CAA's text and purpose and lacks any rational basis. *See* 294 F.3d at 162. As the D.C. Circuit concluded:

> The Act, on its face, neither elaborates upon which control measures shall be deemed "reasonably available," nor compels a state to consider whether any measure is "reasonably available" without regard to whether it would expedite attainment in the relevant area. Further, the EPA reasonably concluded that because the Act "use[s] the same terminology in conjunction with the RACM requirement" as it does in requiring timely attainment, *compare* 42 U.S.C. § 7502(c)(1) (requiring implementation of RACM "as expeditiously as practicable but no later than" the applicable attainment deadline), *with id.* § 7511(a)(1) (requiring attainment under same constraints), the RACM requirement is to be understood as a means of meeting the deadline for attainment, Approval, 66 Fed. Reg. at 610/2. Because the statutory provision is ambiguous and the EPA's construction of the term "RACM" is reasonable, we defer to the Agency. *See Chevron,* 467 U.S. at 843, 104 S. Ct. at 2781-82.

*Id.* However, though our opinion defers to the EPA in exempting certain proposed RACMs from the requirements of the CAA, we must impress upon the EPA that it has a duty to: (1) demonstrate that it has examined relevant data, and (2) provide a satisfactory explanation for its rejection of those proposed RACMs and why they, individually and in combination, would not advance the Beaumont area's attainment date. *See Ober*, 243 F.3d at 1195 *(quoting American Lung Ass'n v. EPA*, 134 F.3d 388, 392-93 (D.C. Cir. 1998) ("[U]nless [EPA] describes the standard under which [it] has

21

arrived at this conclusion, supported by a plausible explanation, we have no basis for exercising our responsibility to determine whether [EPA's] decision is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. . . .")).

## CONCLUSION

Accordingly, we **REVERSE** the portion of the EPA's final action at 66 Fed. Reg 26,914 (May 15, 2001) granting the Beaumont area an extension of its attainment date.  However, we **AFFIRM** the portion of the EPA's final action that treats as potential RACMs only those measures that would advance the attainment date and considers implementation costs when rejecting certain control measures.  We **REMAND** this case to the EPA for proceedings consistent with this opinion.  On **REMAND**, the EPA must describe the standard under which it has rejected certain proposed RACMs supported by a plausible explanation.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED.**